Good morning, your honors. My name is Phil Thomas, with the firm Leonard Carter, here representing the petitioner, International Longshore & Warehouse Union, Local 17. I'd like to reserve three minutes for rebuttal. This is a very straightforward case. This is a question of whether the board's decision was supported by substantial evidence on the record as a whole. Key phrase there being, as a whole, which from Universal Camera and any number of other cases includes evidence that detracts from the board's conclusions. And there's quite a bit of that. This case is a right-line case. That's the board case that analyzes allegations that an employer terminated someone or otherwise took some sort of action against employees based on their union activity. And in the decision below, the ALJ decision, the ALJ found that the general counsel had not met the burden to show that the employer was motivated by anti-union animus when it terminated these two employees, Mr. Esparza and Ms. Dolierova. Well, this was the same ALJ that had said that they were, that reinstated a couple of employees, too. Exactly. Right? Right. And in the previous case, which we call in the brief BDG 1, this being BDG 2, in BDG 1, the first person terminated there was in, I believe, May of 2005 and the second in June. Now, Mr. Esparza was terminated in September of 2005, and the National Labor Relations Board had not even issued a complaint on the original two terminations at the time that Mr. Esparza was fired. Well, let me ask you this. I mean, substantial evidence is, you know, obviously we have to look at it through, it's an appellate lens, and it's not what I would have done. And, you know, clearly, you know, I think to those of us that don't work in this particular company, it seems to be a fairly harsh, you know, you know, compared to what you see other people getting fired for, that it, you know, it appears to be fairly harsh. Yes. But that being said, when I look at the evidence, I think the ALJ made certain comments to the effect of, well, if, you know, there are some credibility findings in here, and if I don't say it specifically, if there's disputed evidence on it, you can assume from that that I believe the side that supports what I have to say. So the ALJ is seeing the people, is making some. And it appears that you, that evidence was put on of a number of people that actually removed things from the premises that nothing happened to. And then it also appears that there was evidence put on of that the two employees that are in question here, there was evidence put on that there had been a meeting saying that you can't remove anything, including the trash. And I think as to the female employee, there were comments, there were employees that told her, you better get permission. Don't take those boxes or, you know, something along those lines. And Mr. Esparza, the male employee, it also appears that he, when he's initially confronted, he admits, no, I didn't get permission, I've gotten permission before. So you have all of that. And then the ALJ seems to say, well, and apparently there was some other person that's also been terminated that wasn't in these proceedings that had been, that didn't have any union before even the unions came on, that had been terminated for similar activity. So the ALJ basically says, yeah, there's some people out there that, you know, that didn't get terminated and their supervisors for whatever reason didn't report them into, put them in this sort of complaints to higher management. But all of the people that went this route, regardless of union activity or not, ended up getting terminated for these type of things. And I think that the government, and not the government, but the employer met his burden to show, we would have terminated this person regardless of whether they'd been, you know. When I got that, how do I, you know, aren't you asking me to reweigh the evidence? No, Your Honor, because several things there. First off, just going in the order that you went on, the credibility findings, the ALJ basically, as you said, makes a few boilerplate statements saying that I've evaluated the credibility of everybody and if I don't specifically say it, I have evaluated it. And just two weeks after this decision, this was decided September 16th, 2008, on September 30th, 2008, the board decided PPG Aerospace, where they remanded to the ALJ for failure to make specific credibility findings when that ALJ, a different one, had made similar boilerplate statements to this one. So if it seems to us that if it's, if the boilerplate statements are not good enough in one place, they shouldn't be good enough anywhere. And I also cite a number of other board cases that deal with remands because the ALJ failed to make specific credibility findings on sky is blue, sky is red kind of issues. Okay. On the meetings where the employer may or may not have informed employees that the rule applied to items found in the trash, the meetings there were different. The Esparza meeting, the second employee terminated. She's the one who took the boxes. Six people who were at that meeting testified. And the judge seems to have believed the supervisor's version of events. He testified that he informed employees that the rule applied to items found in the trash. A lead who was at that meeting after being prompted by the employer's counsel said, yes, the supervisor did mention trash. But none of the other four employees who were at that meeting said the supervisor mentioned trash. So that's the kind of situation where the board doctrine requires specific credibility findings from the ALJ to say why is he believing this side and not that side. Am I wrong or does it seem like the people that some of, I want to pronounce it, the female employees, that her name, Mrs. Stoliarova. Stoliarova. Stoliarova. Stoliarova. That it looks like, you know, people weren't, they said, you better get permission, you better get, you know, all these people. It looks like her coworkers turned her in. Yeah. There seems to be some indication that even maybe the union turned some people in to kind of fly these as test cases or something. The employer did say that in a position statement that they sent to the NLRB. And the record isn't clear on exactly how the employer found out. I think it's significant that the employer didn't find out, except for the fact that she was turned in, because supposedly this is, you know, six, seven months after Esparza's terminated, they have this policy of complete 100 percent enforcement of this rule. And she walks right out, right past security with the boxes. But it sort of cuts both ways. You know, I see your argument, but I can see the other argument, that it's not the employer going after her, it's someone turning her in, and then they have an obligation to investigate and enforce their policy only two weeks after they've had a meeting saying it's going to be strictly employed. And so the ALJ from that could, you know, if you have to give inferences in favor of what the decision is, could infer that, you know, the employer wasn't, didn't want to go after her. She, some of the other coworkers, like, put her on the plate and, you know, were sort of taunting, saying, hey, here, here it is, do something about it. If you really mean that you're going to enforce it, do it. Right. Although the testimony in the record, the primary testimony comes from a union supporter who said that she had made those comments to Ms. Dolirova in kind of a smart-ass manner, saying, well, I hope you got permission, in the sense that expecting that the employer might decide to enforce the rule in this case because Ms. Dolirova had been a union supporter. The ---- I don't want to hijack your argument, so you can get back to work. Oh, okay. But I did want to ask that question. The ---- well, the Board's argument, and so one more point before that, is that this case, just as a way to look at this case, it's very similar in structure to the SEIU Local 399 St. Vincent Hospital case that was decided by this Court in 2006. That's 463 F. 3rd, 909. It was also a right-line case. It was also a case where the ALJ said there wasn't sufficient evidence of anti-union animus. When it got up to the Board, the Board said, well, we're going to assume animus, but decided on the affirmative defense, that the employer showed that it would have taken the action anyway. And the affirmative defense piece of this is significant because the evidence that you were talking about regarding the disparities in enforcement, when the ALJ analyzed that in his decision, that was in the context of determining whether or not there was anti-union animus on the part of the employer. And the way the judge looked at it was, well, no animus on the part of the security guard, no animus on the part of the lead, on the part of the supervisor, going through those steps. But that ---- those disparities in enforcement are much more significant for purposes of analyzing the affirmative defense, showing the employer would have taken the same action anyway. And the evidence in the record, and there's just quite a bit of evidence, current employees get on the stand, sworn testimony, looking right at their bosses, saying I've been taking stuff out of the plant for years. And if the employer is 100 percent universally enforcing this rule, those employees should have been fired right after the hearing. And they weren't. Well, but can you catch everyone? Or can you assume that everything goes in the process?  That's the issue. That's what the ALJ was looking at. Again, I don't know if the ALJ was looking at that, because the ALJ was looking at it just for animus purposes, not ---- Excuse me. Is that before the Court, that they were not fired, that those employees were not fired after the hearing? No. No. I mean, it's not an issue here. Well, I mean, we don't know enough about that to pay attention to that for purposes of reviewing this. I mean, I understand your point. A bunch of people confess to the same conduct, and for consistency, they should have been fired, too. And then you say, and they weren't. But we don't know that for purposes of review of the record. Fair enough. Okay. Anyways. The ---- So to the issue of where the Board says there in footnote 4, where there's about three lines of analysis is the entirety of the Board's case, where they say that the employer had applied the rule to items found in the trash in the past once. Once they did that, that was the employee who attempted to take the ten cases of canned, packaged almonds that had become contaminated. So the burden of establishing a past practice is on the party asserting it. That's very well established in Board doctrine. The employer here, for purposes of the affirmative defense, is trying to establish the past practice of pretty consistently enforcing this rule, whereas they've only found it in the trash, and they have not enforced it against things taken out of the trash, you know, a number of times, a lot more often. They've also not enforced it against items not found in the trash, such as pins, hairnets, earplugs, and almonds off the production lines. You can eat almonds in there, and this is a company that sells almonds for a profit, and you only get a written warning. I'm down to three minutes. I would like to reserve the remaining. Thank you. Good morning, Your Honors. May it please the Court. I'm Greg Lauro for the Board. Your Honors touched on a couple things this morning. One is, this case is presented on the substantial evidence test, where the question is whether substantial evidence supports the Board's finding, not whether all of the evidence supports it or that my opponent can point to some evidence that goes the other way. And I think Your Honors touched on the substantial evidence that supports the Board's findings today. There was a... Well, can you point to, besides Gutierrez's termination in 2003, and that was before the unions were there, can you cite any other instances where misappropriation rule was enforced that's in the record? Well, in all four instances where employees were found to violate the misappropriation rule, they were fired. But as you know from the record, we're not claiming all of those instances are exactly factual analysis, but the company has consistently applied the rule. In all four cases where a violation of the rule was found, the employee was terminated. But I think it's important to look at the company's past application of the rule, how it had applied it to discarded items and items in the trash, and how it had told employees that on several occasions. First, as you mentioned, before the union came on the scene, this employee, Mr. Esparza, was charged for taking discarded items without permission. After that, the company sends a memo to its supervisor saying, we applied this rule strictly. Nothing can be taken without permission. Pursuant to that, Mr. Spain, one of the supervisors in question, holds a meeting in 2003, reminds employees, don't take anything without permission, including trash. Esparza is at that meeting. And then the next thing that happens is we have Mr. Esparza getting caught taking things without permission. And during the investigation by the company, he admits several times, I knew I should have got permission to take these items. Based on that, the company discharges him consistent with his past practice of enforcing this rule. And in the case of the union. It's pretty harsh. I mean, it makes me scared that I would take a pen off. I mean, I constantly find I have about ten pens in my, you know, which are technically government pens that I'm working at at my desk and I keep putting them in. But, you know, it's pretty harsh policy. Well. I mean, if a person accidentally did it, is it, it has to be intentional or what's the? Well, there isn't a rule that it has to be intentional. I mean, here the facts show that Mr. Esparza, for example, admits he knew he should have gotten permission and that with respect to Ms. Stoliarova, she knew or should have known. As I believe you mentioned this morning, she had been told at a meeting not to take anything without permission six days before she then took items without permission. And at that time, some employees gathered around her and said, I hope you have permission. And that does lead to something I want to clarify. In terms of alleged conflicts in the record, my opponent mentioned this morning that there was some varying testimony as to what was said at that meeting where the supervisor said, don't even take trash without permission. The supervisor testified he reminded employees that. One employee testified she heard that, don't take anything, not even trash. And other employees simply heard, don't take anything without permission. And some of those same employees whose testimony my opponent is relying on then gathered around Ms. Stoliarova and said, did you get permission? You need permission. So all this testimony shows they understood the rule as requiring you to get permission to take anything. Well, there's a great deal of evidence at the hearing about people who took things without permission. There's a substantial number of people who admitted that and that their supervisors knew about it, and nothing happened. So I'm confused about your position that this is the company position and it's consistently applied. Those other misappropriation cases are radically different from these events. And isn't it true that the record reveals that people took things often, frequently, and were not punished for it, and the ones who were punished were these two people? Your Honor's raised a couple points, and I'd like to respond to both of them. One thing you mentioned was that the prior incidents where employees were discharged pursuant to this rule were radically different. That is the union's position. But I would submit that Mr. Gutierrez's discharge actually raised similar facts. Both took items from the trash without permission that were potentially dangerous or could potentially subject the company to liability. So I do think there is a factual difference. Well, how are these cases potentially dangerous or subjecting the company to liability? Your Honor means in Mr. Esparza's case? You tell me what you think is analogous. Well, the company reasonably viewed the item he took, which was a weed whacker with a severely ruptured gas tank, as potentially dangerous. Well, and you think that's analogous to taking tainted almonds made by the company? I think the analogy is that both items can potentially subject the company to liability if they're taken without permission and the company has no control over where its property goes. Okay. Yes, I do. Excuse me, I'm sorry. Go ahead. But I appreciate Your Honor's point, and the judge acknowledged this. He acknowledged that there was evidence that some lower-level supervisors had sometimes with less than strict consistency, I think was his phrase, applied the rule. But a couple points about the evidence. And I recognize there are incidents, for example, where employees took plastic bags, were given plastic bags to shield themselves in rainy days, and had perhaps walked out with them to their cars in full view of security and didn't get in trouble. That's acknowledged. But we have to put this evidence my opponent is citing in context. He cites a whole plethora of things, some of which are material and some of which are not as strong as he suggests. For example, he mentions eating almonds on the line. Well, as the company explained, that's a violation of a different rule that provides for a warning. There's nothing inconsistent about giving a warning for a rule that provides for a warning and discharging someone under a rule that provides for probable termination. Let me ask you, do these cases necessarily get decided the same way? Ms. Dolly Roe is taking boxes. I don't know how you – if you have a credible argument you can make about danger and liability potential about an empty box, go ahead. But – I should be clear. I'm not suggesting that the employer is required to find that the item is dangerous. No, I understand. I'm just reacting to your – the distinction you're making. And it causes me to ask you, do we have to decide these cases in the same way? I don't – not in the sense you're suggesting. I mean, I think my point about potential danger was just to rebut the idea that what Mr. Esparza did was wildly different than what Mr. Gutierrez got to charge for. And that's just a response to the union argument. Okay. But if we're talking about people being treated the same, that why – okay. If I accept your argument that the weed whacker is – you know, does – it's more dangerous. You know, you can – it could go off. It could fly out and hurt someone and the company gets sued or any number of things. The boxes. Why aren't the boxes like the plastic that you put on your head when you walk out? Well, I think the point here is – I mean, is it possible that there could be substantial evidence as to Mr. Esparza and not substantial evidence as to Ms. Stolaroba? I do think it's possible in that you're looking at the facts specific to each discharge. Although I do feel there's substantial evidence clearly. I know you're not conceding there. Sure. Of course. But I appreciate your point that you are looking at each individually as well. But I think the case is very clear with respect to Ms. Stolaroba. And the facts are essentially undisputed. She was reminded not to take anything, including trash, without permission on April 21st. On April 27th, she attempted to walk out with items without getting permission. Employees who were at the same reminder meeting she was at told her not to. You'd better get permission. And she walked out anyway. And when you look at the facts regarding how the company investigated her conduct, it shows that they focused on her violation of the rule, the fact that she had just been reminded not to do this, and the fact that she thus knew or should have known she was violating the rule. And that's the point here. It supports finding that the company would have discharged her even absent her union conduct. Are we to construe this as a change in policy based on the enunciation of the policy at the meeting? Or is this just a reminder about the existing policy? And if it's the latter, doesn't that render germane the history of non-enforcement of the policy? Well, I think the point here is that the company had applied this rule to discarded items going back to 2003. That didn't change. There is evidence of a past practice of doing that. And since employees were still violating the rule, the company from time to time reminded them, don't take anything, including trash, without permission. As to a change, I wouldn't concede there was a change there because these reminders about not taking anything, including trash, the record shows, go back to 2003. But the only example you can cite to me is the one example about the tainted almonds. Isn't that true? That's the only example. Remove from the trash. That's the only example. That's the only example of an actual discharge, if that's what Your Honor thinks of his application. But there's also the fact that the company is communicating with employees and telling them how it views this rule and that it views them, the employees, as needing to get permission to take anything out. But in the post-union era, there's no enforcement of this, don't take anything from the trash, except for these two individuals. Is that true? Well, those are the two incidents at issue. Well, that's not my question. Do you have any incidents post-union where anyone is terminated for taking anything from the trash? I'm not sure that we do. I believe what happened. Well, I thought there were two other people that this ALJ said the employer got wrong. In this particular case? Yes. Perhaps we should hear from the ALJ. I mean, I know there was a reference to an additional case, but I wasn't sure if a claim was being made that those were discharges in this case. I mean, as I understand it, there were three employees at issue in this case, Esparza and Stoliarova, whom we've discussed, and another gentleman named Aguirre, whose case didn't make it to court. The charge was dismissed, and that's not on appeal here. But in the post-union era, if you define that as after 2005, and I want to be clear, I don't want to get confused because I realize we have a lot of different cases here, but if we're talking about violations of the misappropriation rule, I'm not aware of post-union instances of employees other than these being fired for the misappropriation rule per se. I know in PDG 1 there were violations of other rules like the good manufacturing practice standards. So I would have to check. You've used your time. Thank you. Thank you. And to you. The Court has this time. May it please the Court, Raymond Lynch representing Respondent Intervenor Blue Diamond Growers. Let me jump right to the record because I feel like I'm quite familiar with it. And let me first deal with Mr. Gutierrez. Mr. Gutierrez is striking evidence and probative of the Esparza discharge for this reason, for several reasons, really. First of all, Mr. Gutierrez was a co-worker of Mr. Esparza. He was in the same chain of supervision as Mr. Esparza. And he was terminated for taking something out of the trash a year before there was any union activity in the plant. And Mr. Gutierrez defended his position on the ground that the material was in the plant, had little value, and therefore he should not have been terminated. And he defended his position in that way because there was a grievance procedure available to him at the company which he invoked. And his position was considered and was rejected. And the issue there is that the company did consider it. They rejected it. They issued a memo and said this is the policy that we should have. And notably for Mr. Esparza, his supervisor, Mr. Spain, held a meeting. And Mr. Esparza said he was there and the rule was communicated. If you look at Judge Pollack's decision, and it's detailed, and there are findings in it, with respect to Mr. Esparza, he recites what took place. He, Judge Pollack, based on the testimony of four witnesses, Esparza himself, Mr. Spain, Mr. Nichols, and Mr. Johnson, and the recitation from the beginning of Mr. Esparza taking the material and attempting to get it out of the plant through the resulting investigation and through the termination is really based on those four witnesses virtually undisputed. And Mr. Esparza repeatedly during that process admitted that he needed permission. He never said that he didn't need permission. He understood that every step of the way, he acknowledged that. And there was a reason, I believe, why he said that. First, because there was a handbook that he'd signed and received as had all employees that identified a work rule that said you can't misappropriate property. And because he was aware of the Gutierrez termination and, in fact, he had undertaken to take things out of the plant before and obtain permission for it. And Judge Pollack walked through that and then analyzed the rule. He acknowledged differing testimony, but there was evidence presented that there were over 500 passes signed by management for employees to take materials out of the plant. And he made an express finding with respect to Esparza that the removal of the property reached management, reached the investigation in a benign and nondesperate way, that the investigation was nondesperate and, therefore, that the termination was proper. Stoliarova's termination flows from that. And the notable thing there, I think, when you talk about these two cases together, there are very stark similarities between them. And they are noted by Board Member Liebman in the Board's affirmance where she says there was, in the removal of this material, it was not an – they were not engaged in protected activity when they removed the material themselves. That reminds me. I have a question. This was a two-Board member decision? Yes. Well, and the Supreme Court has recently granted cert in a case to resolve a circuit split on whether a two-member quorum of a Board lacks authority to issue decisions. Yes. Should we hold this case? I believe the Court has the – we did not object to the two-member. We ceded to the jurisdiction. Everyone else did. Well, I know, and you won. But, you know, that the – No, but did anybody object to it? No one objected. It just – it simply was not raised. And – And in the Supreme Court case, was it raised? In the Supreme Court case, it was raised. Yes. That's my understanding of it. Yes. Yes. Okay. Are there any further questions? I believe it's before the Court. I did want to make a point. Well, your time has expired. I'm sorry. All right. Thank you. We hope to use it. On the question of the two-member Board, we didn't make an issue of it. Again, we probably could have, but we figured that fight is being waged by other people. So we'll – Well, but then does that waive any objection? Let's hope so. I would imagine it does. It – you know, I mean, we – whatever the Supreme Court decides, we'll take that. That's not – you know, if that's not a fight, we chose to fight. Sounds like a waiver to me. Yes. Are you waiving it now on behalf of your clients if you haven't already done it? On whether or not the two-member Board has jurisdiction? Yes. I would figure that we had waived that from the beginning by – Right. Anyways, to address kind of in reverse order what counsel said, that Mr. Esparza, during the investigation, that he said that, yeah, I know, I understand, I need a conversation among equals where – but it's not. The company has just fired – you know, you go back to September 2005 when this happened. The company has just fired long-service employees, Camilo and Flores. This was in the previous case. The Board has not done anything about this yet. Mr. Esparza is confronted by the employer. You know you need permission. What employee is going to say to the boss, no, I can take this stuff without permission. I don't need your permission, boss, to take this stuff. All right. And the text of the rule. I think that's material here and we addressed this in our brief. The rule itself doesn't say anything about the trash. However, it is in the record that in September of 2006 the employer amended the rule to say that it does apply to items found in the trash. Quite a bit of testimony from various employees about their understanding of does the rule – you know, what's the meaning of blue diamond property here? The rule on its face also doesn't make any distinction between the property of blue diamond and the property of employees. But it's clear from the record that the employer enforces the rule differently when it comes to property discarded by employees versus discarded by the employer. Okay. So, but anyways, rather than re-argue the merits, the issue here, the reason we've appealed this and the argument we make on our briefs, it has to do with the quality of the Board's decision, particularly the ALJ's decision where there is all sorts of conflicting testimony and the ALJ does not make specific credibility findings. And there is a lot of Board case law saying that that demands a remand, whereas the Board here just affirmed it on a different ground that wasn't even briefed. Thank you. Very good timing. Thank you. The case disargued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Lynn, Schroeder, Callahan